Good morning, may it please the court and counsel. My name is Jeffrey Feiner, I represent Mr. Breidenbach. I will be arguing in the first instance. I'm going to try and reserve two minutes for rebuttal. And with the court's permission, there may be a few moments if I'm done. I would like the court to hear argument from Mr. Levy's attorney, Mr. Mark Lehman, who's prepared to address some of the— The only question is you can allocate this time however you want. We'll not be giving extra time. I understand. But if you want to allocate it within your own time, of course, no problem at all. Thank you, Judge. Please proceed. Your Honor, this case challenges a grant of summary judgment on behalf of the defendants against plaintiffs. And the facts are unusual, and I want to spend the opening moments being real clear. Although unusual, they're not complicated. Several summers ago in Spokane, Washington, a gentleman was noticed to be on a bridge in the downtown Spokane area, on the edge of a buttress over the gorge that goes through Spokane some 180 feet above rocks. The situation as it evolved determined that the young man had grievous psychiatric disabilities, had been off his medication, had recently returned to Spokane, and had a history of previous attempts, and one instance where he jumped from a bridge. Another instance where it was reported to officers that he had made some grab to an officer attempting a rescue. What becomes key is to understand that this situation was relatively static for about 20 hours. They shut the bridge off on either end. And it was static in the sense that Mr. Levy, the young man on the edge, was giving very little direct information, responding only minimally and only on a few instances. And the officers noticed whenever they made any approach towards him, he became highly reactive. And they knew he had paranoia. And they knew he was disturbed. There was no reason to think he was armed, and there was no one in any risk of harm other than Mr. Levy himself. A plan developed, and in part that plan was developed because there was concern. The gentleman had been out there for 20 hours, and he was going to get him tired. Not only that, but he was, oh, I'm glad you added he was getting tired, and he didn't seem to like them getting around him. No, he was very distressed when anyone came close. But there was some communication going, and a plan was developed. And here's where I want to emphasize, because here's where I think is the failure and the specific gravamen of this case. Your Honors, this wasn't a late at night, two officers in a patrol car. There were negotiators. There was paramedics. There were officers everywhere, and there were senior Lieutenant Toombs who had been on the scene from the very beginning. And Lieutenant Toombs met with several of his officers, and they didn't come up with, well, what do you think we ought to do? They worked out a plan. And it wasn't in one of those highly emotional, fast-evolving, dangerous situations. They sat back, and they stroked their chins and said, what do we do? And they came up with an idea. Because he was next to this large portico, photos of which are in the appendix, if he could be worked into that portico. Or work himself. Or work himself. He could be tased, incapacitated, and then rescued. Rescued. There's no question in my mind that the subjective intent was to rescue this man. I don't come to condemn anyone for their subjective intent. But here's how it works in the official world. When a lieutenant tells a subordinate, here's the rules, the subordinate follows them or disregards them at his peril. I don't want to interrupt your story here, but I want to be sure that we focus on what we have to deal with here in the court. And I'm coming to that. This is not a trial court. Yes. We have a situation here where there's been a finding that these officers had qualified immunity. You know as well as we do what the Supreme Court has said about that. What I want to know is what's the authority that you have that shows that the officers in this case should have known that what they did was unconstitutional? Very good. What is that case or what are those cases? It's a line of argument and I will address it directly. Okay. Underqualified immunity. Frankly, I think it's a line that you ought to hit right now since the good judge seems to think it's important to him and it's quite important to me. You can go through that use of reasonable force, and I think you may have to on my account, but right clearly established is pretty important. I'm sure you know about Ashcroft versus Al Kidd. You probably read even who wrote that. And this about was the right clearly established is pretty dang important. So maybe you ought to get there. I'm right there, Judge. Okay. Underqualified immunity, there's two bases for an officer to lose qualified immunity. One is incompetence and the other is a willful knowing violation of established law. You're not going to argue incompetence, are you? Oh, I am. Oh, okay. And let me set why. Okay. Well, first of all, and it's established in the record, the following are uncontested points. Both sides agree to the following. That Mr. Officer Kale was not rushed. He had a clear view. The view from Mr. Kale's position is in the appearance. He knew and he said in his own deposition that if Mr. Levy was by the buttress, if he was outside the portico, it was too dangerous to do. The effort, the attempt to this rescue effort was too dangerous. He says as much at 823 of the ECR. His superior, Toombs, said he would not allow the attempt if Mr. Levy was outside the portico. Now, this is the commanding officer. The reason I'm here on this case is a commanding officer said to his subordinates, if he's inside the portico, this is the plan, pages 1400 and 1401. It's in black and white, Your Honors. Well, wait a minute. Yeah, I get your point. You're obviously a very good lawyer, and if we were a jury, it might be a different issue. But the reality is incompetence is not negligence. That's true. And it sounds to me like what you're saying is that because this subordinate officer didn't follow what he was told, that he was, in quotes, incompetent. Is that what you're saying? I want to add two things to that. Okay. He said to us in deposition that he knew, he knew that if Mr. Levy was outside the portico, Mr. Levy would be at high risk of death. Everyone knew that. This was a rescue or a death, one or the other. He knew that he was ordered, because he asked, he was ordered to do this when the man was inside the portico. Kel said, Take all that as being true. All right. Does that make him incompetent for purposes of removing qualified immunity? Yes. Drummond v. City of Anaheim. And here's the quote. It is difficult to conclude officer's actions are reasonable if the officer performs an action banned by the department, which has to do with policy, or of whose danger in these circumstances they had been warned. Well, that's different. And you're talking about a Monell issue there. This is not what we're talking about, is it? I disagree. This has to do with qualified immunity under the circumstances where an officer is not reasonable because he disregarded Is lack of reasonableness incompetence? It is when the officer himself says, I knew, I was told, I had time. And you say that case says that? That quote stands for that proposition. I'll be fair. That's the first time I've ever heard that argument, but I guess I better read it again. Drummond is not generally cited by plaintiffs, I agree. But Drummond says very plainly, and it is not in any way contrary to this circuit's jurisprudence. We get all kinds of quotes, and you can find quotes for anything you want in almost any text. But we have to look at the facts. We have to look at what was determined. And are you saying that Drummond v. City of Anaheim is your best authority for the concept that this officer was incompetent to the extent that qualified immunity should be removed? No, I do not say that. If it's not your best case, what is? With these facts, there's no case. Okay, so there's no case. So that gets us to the second problem, which is, how could this be clearly established law that gets you around the qualified immunity issue if you don't have a case? Because there's no case on these square facts. That's my concession. Okay, well, that gets you to Al Kidd that my colleague talked about, a case I know something about. And the Supreme Court, we cited in there the concept that people have had to have probable cause to question people about their own things since the beginning of time. They didn't care. They said you've got to have a case basically not necessarily on all fours, but it's got to be pretty close. That's the United States Supreme Court. We are subordinate to them. And they made it really clear that in connection with qualified immunity that those are the rules. How do you get around that problem? On a two-prong argument. One is that force is considered deadly if there's a substantial risk of causing death or serious bodily harm. There is no question, it's not even contested, that rushing to this gentleman and giving the signal for the taser when he was outside the portico was against the orders of his commander and would likely cause a death. Our expert Roger Clark said as much. If you put force against a suicidal individual and the force is aimed towards the danger, you're causing a risk of fatality. That is the use of deadly force. Only in these narrow circumstances. We're not saying tasers are deadly force in general. But, Judge, in this instance, jumping the gun, shooting at this man when he was not in the portico, when he was told not to give the signal until he was in the portico, is plainly incompetent. And then the case law for that that comes from the 1901, excuse me, 2001 cases, Delorey v. Rutherford, which says... When you say Delorey, you're talking D-E-O-R-L-E? Correct. Okay. Because I didn't pronounce it like that. I just want to make sure I got the right date. I appreciate your assistance. I'm not sure how it's pronounced. It's the Delorey, I believe, v. Rutherford, 2001 case. And it indicates in Delorey to take account of the individual's mental illness. He's not a criminal. He's not threatening anyone. They can take into consideration how tired he has become sitting out there for 20 hours and whether he's going to fall off on his own, right? I cannot say there was no risk of that. It's possible. And I hope you're not reading the Orly, I guess that's the way you said it, to say that when one is emotionally disturbed, that knowledge is determinative. No, it is a factor. It's only a factor, right? Yes. I gather you are arguing, though, that I think you yourself said there's no argument that subjectively these officers were trying to kill this gentleman. There's no evidence of that, no. They were trying to help him. Now, you claim that they didn't do it right. I understand that. You claim that they knew all these things that you're talking about. Let's say that's all true. Are you equating what they did with the basically outrageous use of physical force that we get in some of these police cases? You're equating? No. In other words, you're saying it's just the use of deadly force. When the superior officer on the scene in a quiet moment. But you're talking about the chain of command. I'm talking about what was done, the use here. You're saying that equates to deadly force equivalent to, say, for example, somebody who comes into somebody's apartment, no probable cause or whatever, and they shoot somebody. No, that's a false dichotomy, Your Honor. That is not what I'm arguing. Okay. And it's a false dichotomy. Okay. The man's commanding officer said, here's my proposition. Here's my one stipulation. He has to be in the portico. It was disregarded. Why was that disregarded? He didn't know. No, he said he knew the rule. He was excited. He doesn't say that. He didn't have a better shot. He doesn't say that. It was an evolving situation. He said he wasn't going in the portico. He doesn't say that. What he says was, well, I thought he was in the portico. Well, no evidence supports that, including the appendix that I provided that shows that Mr. Levy was not in the portico. Your Honor, it's plainly not. Do we have evidence enough to say that your client was in immediate danger to himself? No. He was at a danger but not imminent. Why? Because he'd been there for 20 hours. He was tired. He was on the top of a great big bridge. And I guess it's assumed that if he goes off, he's dead. True. Then, not only that, he'd been uncooperative with the police for 20 hours. So here we have a person who is in a place he shouldn't be. We have him tired 20 hours without, I think we could say, food or rest. No, we can't. No, he'd been passed some water and refreshments. Okay, water and refreshments. All right. So we got rest. And then he'd been uncooperative for more than 20 hours. And at that point, we're going to say that one who shoots this person, I guess mistakenly since the plan was something else with a taser and misses, which I think is negligence, I can't find it to be much more than, that that is enough to say the right is clearly established. No. I'm not focusing on the one who did the shooting. I'm focusing on the one who gave the signal because he was told by his superior, Your Honors, the line of command is a constitutional provision to some degree because this officer said, I knew not to shoot unless he was in the portico. Do you agree that you are asking us to make new law? No. I don't think so. And I think this is fairly narrow. I think this plainly comes under what we've understood for many years what lethal force is. And everyone who's been deposed said we were not going to do this unless he was in the portico. We were told not to do this unless he was in the portico. It was too dangerous to do it if he wasn't in the portico because he could fall off or he could jump. If he had access, he would go. Everyone knew that. Judges, everyone knew that. And he disregarded that. Now, I don't know a proposition of law that allows an officer to ignore the superior commander's instruction. I think we have that point. You are over time. So let's hear from the government. We will give your side a minute to respond. I may leave that for Mr. Lieber. Whatever you decide. That's fine. Let's hear from the government. Good morning, Your Honors. Heather Yakeley here on behalf of Spokane County. I represent it directly. However, I will be arguing for both the city and the county. The city attorney is also present, as is Sergeant Yamada. You're the only one that's going to be arguing, though, right? Yes, Your Honor. Okay. Mr. Heber, if you have any questions with respect to the cross-appeal, would answer those questions. But I don't believe that's the focus of today's argument. I want to, quite frankly, go directly to some of the questions that the Court has asked, because I believe that's your focus. The first thing that I would like to do is I would like to add plaintiff's counsel is focused on the against orders of commander. And I believe, Your Honor, it was Judge Walter that said, well, isn't that a Monell claim? Yes. That would go to an issue of whether or not there was a claim against the county or the city, but that's not before the court. The only issue before the court is the question of qualified immunity. So whether or not it was a disregard of a commanding officer, one, would not necessarily be relevant to the qualified immunity standard, as well as that's not particularly what Lieutenant Toombs said. In fact, I'm going paperless here, so what Lieutenant Toombs said in response to his- Hold on one second. Our clock has stopped here. I don't know what's going on, but okay. Maybe you've got to move it down a minute, because I think we've been going for a little while. So hold on a second, counsel. Okay. There we go. That's fine. Okay. Go ahead. Lieutenant Toombs actually said, he was asked the question, have I done some injustice by dividing it, meaning the plan, into the three separate parts? There is some colloquial discussion in his deposition about the rush versus the taser. And Lieutenant Toombs was very specific when he stated, as long as the numbers don't have any significance, the order doesn't have any significance, I don't have any problem with you breaking it into three. And that's at page 1441 of the record. So Lieutenant Toombs, in his deposition, as well as all the other officers which are cited in the record, recognized that if they could grab him without the taser, they should do that, as long as they could do it safely. This plan was the plan that they came up with because Mr. Levy was, unfortunately, leery of police. 20 hours had established that. So that's one of the things that I want to- Let's assume counsel, just for purposes of our argument, not what the record says, let's assume that the facts are as presented by opposing counsel, just arguendo. And let's assume that the officer knowingly, perhaps out of zeal, but knowingly violated the order of a commanding officer. What role, if any, does that play in our qualified immunity analysis? Your Honor, with respect to the qualified immunity, I don't believe that it does. The issue is whether or not the actions were reasonable. The courts, as well as the circuit, have very clearly said, look, it doesn't have to be a perfect plan. And unfortunately, this plan was as good as they could come up with. This plan was after 20 hours, after the concerns were mounting. Plaintiffs have kind of ignored the fact that not only was Mr. Levy on the bridge for 20 hours, he'd also been up for at least 30 hours by tracking back to what contact he'd had with police previously. And so you take that, you take the fact that the only way you could approach this gentleman was from the south or the east. So I'm a little surprised at your answer, but I want to be sure I understand it. Your answer is not, well, there's no case on point here, therefore he gets qualified immunity. Your answer is, well, what we have to do is to analyze this in terms of whether what was done, in this case, the arguendo disobedience was reasonable. Is that your statement? No, Your Honor. I'm sorry. I was answering your question a little more narrowly than it. And frankly, I guess I think what you're really concentrating on, maybe I'm wrong, is the use of the force, whether that was reasonable, rather than whether there's a right clearly established. Because it seems to me that the nature of the force is one thing that I have to look at, which the act didn't go as planned, so therefore maybe the nature of the force may lean toward the plaintiffs. Then I have to look at the interest in using the force. And that's what I'm concentrating on here now, and that's what I think you're addressing, is the interest in using the force. And if I look by the interest in using the force, the second one is whether the suspect poses immediate threat to the officers or others, which himself would be others. I mean, is there an immediate threat to himself? Whether he's attempting to resist or evade arrest, well, sure. He doesn't care, but I don't think that's what we have here. What we're really concentrating on is he poses immediate threat to himself. And then I'm supposed to, if I understand the rule, I'm supposed to, if you will, measure the nature of the force against the interest in using the force. And it seems to me that that's where I am as to the use of the force and whether it was reasonable. Would you agree? Yes, I agree that that is the question that you're posing. And the other question that was posed, and I believe, Your Honor, it was by you as well, was what is the authority that shows officers should have known that they did was constitutional? And that's the two prongs under qualified immunity. Pearson v. Calhoun says, no, now the courts don't have to do both prongs. They can do either or. So I'll address both of the questions. I'll address first the issue of the law. As the defendants argued in their brief, and plaintiffs disagreed, obviously, there is no case on point in this. And I will apologize, Your Honor, I am not familiar with the specific case that you've referred to that you wrote the opinion on. But I am familiar with. Okay, go ahead. I didn't mean to interrupt. Go ahead. I am familiar with the Supreme Court's decision that it's got to be very close in facts. And the trial court said, well, I think it was established because of Dior. As I argued in the briefing, as the city argued in the briefing, it's not at all remotely the same. These officers were in an entirely different situation. And quite frankly, I don't believe that there's any law out there, not from this circuit or any other circuit, that has the same or similar circumstances where they had done exactly what Dior said they should have done. If I understand what it was, 20 hours out there, the victim, if you will, is teetering on the edge anyway. He gets down there to urinate and he's given the order, shoot. Dang, he missed. That's it, isn't it? Yes. I mean, if you want to boil it down to the very, very basic facts, McCaslin testified, I don't know why I missed. McCaslin also testified that he independently saw Levy in the portico, which I think is important because that's another issue that plaintiffs raised. So Keel gives the hand signal. McCaslin, who has been trained on the Taser, who has familiarity with the Taser, and having had the opportunity to fire a Taser, they do have lasers, and they are fairly user-friendly to the extent that it's not a, you know, you don't have to really line up. You're not doing this from a long way away. He doesn't know if Levy saw a shadow. Which setting was it on? Stun or? No, it was on the, not the stun, but the barbed. I mean, so he needs to make the, excuse me, needs to make the circuit. Okay. Doesn't know if there was a breeze, which, you know, from my familiarity with Spokane, that's certainly possible. He misses. Yamada and Douglas are crouched down because they're staying out of Levy's view, but they can see the hand signal. By the time they get over the, there's a half wall, if you will, not even a half wall, but a wall. By the time they get over that, Levy is unfortunately, and it is unfortunate, already over the edge. So that's what the facts narrowed down to. Dior said, look, we don't find qualified immunity in this case because they were there for 20 minutes, and I may be wrong on my time, but it was a very short amount of time. It may even have been four minutes. They didn't wait for the, what Spokane County calls the hostage negotiation team, crisis intervention, even though they knew they were on the way. They didn't wait for them. They didn't, they had other opportunities available. Dior was also a situation where there wasn't any imminent harm. And we can argue, and I think that's the argument the plaintiffs have made, that Mr. Levy was not an imminent threat to himself, but the imminency comes out of the fact that he had been there for 20 hours. The officers all testified, and it's all on the record, that they had noticed an increase of fatigue. They had noticed an increase of him nodding off. That's leading to the imminency. So there is no case on point because there's nothing to say, what do we do? It's been 20 hours. We have everybody there. He was actually offered the opportunity, and it's in Deputy, I don't remember if he's an officer or a deputy, Snyder's testimony. They said, how about this? How about we let you just walk down and get into a police car yourself? How about an ambulance? Would you get into an ambulance? And Levy didn't respond to any of it. Not a lot of options available here. Under the scenario as posited by the appellants, I assume that the taser is almost irrelevant here. If there had been a rush, you know, no tasers, but they had a plan where you have officers rush on both sides, try to get around where Mr. Levy couldn't see them. And if they missed, the same problem would occur from their perspective. Is that your understanding? I would say that that's accurate, yes. I mean, if they would have rushed, if he would have seen it, and not, you know, they hadn't been fast enough, then I believe that the outcome would have been the same. But, again, that's speculation. It sounds to me like the plaintiffs are saying that in a suicide, potential suicide situation like this, that the officers are, in effect, the guarantors of the outcome. If they do anything that triggers this, then they are negligent, or what was the terminology that was used? It was certainly incompetent or outrageous or something. Is that your understanding? I believe that's the argument that plaintiffs are making. Right, right. No, I understand that. I disagree that that is accurate. And that goes to the 2020, that the courts have very clearly said, you don't get to judge the officers by anything other than a reasonable officer at the time. And these are the exact circumstances that that line of cases and that line of law has been developed. Because law enforcement, it changes rapidly. You can't account for the human factors that can change. I mean, you go to training on a taser, and then all of a sudden you're out there and you use it in real life. You can't account for weather. You can't account for the down jackets that may or may not be on. That's why the courts have said there is no 2020 hindsight, and that's what the plaintiffs are arguing. Here's a tragic outcome. If I could maybe back up. I'm still on use of force, reasonable use of force, the nature of the force versus the interest in using the force. The plaintiffs seem to think that the Glenn case is controlling on that, that when I'm balancing between the nature of the force and the interest in using of the force, that somehow the Glenn case should tip me over the top as to the fact that, because this nature of the force was unreasonable use and the interest of the force is what it is, that the Glenn case would control. What would you say about that? Two things. The first thing I would say is Glenn couldn't be controlling for those officers on the bridge at that time because it hadn't been decided yet. But putting that aside and going to, you know, the merits of government intrusion, it does not, it's closer to the Dior factors. In other words, this officer approached, there was a perimeter set up, there was no imminent threat to anybody because the officers had ordered, I believe it was a brother or an uncle, and the parents inside, so they were out of harm's way. This gentleman had a three-inch pocket knife and while he had been yelling and screaming, he was not threatening. And, again, I think... Didn't he put the knife to his throat? He did, but not at the time when the officer actually shot him with the bean bag, which the courts have and had previously determined was a less lethal use of force, which a taser is not. And that was three minutes later, right? Correct. That wasn't 20 hours later? Correct, Your Honor. So I have 25 seconds, 24 seconds, the balancing of the intrusion, which goes to your question, Your Honor. Signs of fatigue. Twenty hours on a bridge. He was nonresponsive during that 20 hours. He refused the offers to get down off the bridge on his own. He refused to get in an ambulance, refused to get in a police car. The only approaches available were from the south and from the east. They didn't have any other options. They didn't have a bean bag that would be able to be used safely. They'd use that. Unfortunately, this isn't the movies, this isn't TV. There's nobody scaling the bridge from the other side. He'd made previous jumps attempts. Going hands-on with him, they knew it was going to be a problem for Mr. Levy, as well as potentially for the officer's safety, which the courts have also said officers are allowed to consider. So with that fact, then you take the government interests, which are statutorily mandated in Washington, to take into custody an emotionally disturbed individual. And you also have the realities of the 20 hours. He's falling asleep, his safety. But this is a major thoroughfare in Spokane, Washington. Resources have been there for 20 hours. They've gone through the city team already. At some point, there has to be some break in this. And I believe it's a reasonable statement to make that after 20 hours, he most likely wasn't going to simply just get down. And the reality was falling off was becoming more and more of a reality. Thank you, Your Honors. Thank you for your argument. We'll have one minute, if you want, in rebuttal. Thank you, Your Honor. I'm going to try to answer the questions that you asked, Mr. Feiner, as quickly as I can. First of all, I think Diorre does control the question as to whether there was an established law. And what this Court said in there was, a desire to quickly to resolve quickly a potentially dangerous situation is not the type of governmental interest that standing alone justifies the use of force that may cause serious injury. Now, the question here is, could they use deadly force to stop this man from committing suicide? And that's what happened here. Because, again, as Judge Smith ---- You forgot quickly, didn't you? Pardon? You really forgot quickly, didn't you? Quickly what? Diorre is not the same as this case as it relates to quickly. Actually, I disagree with that. In the 20 hours they tried to do something with your client or the estate's ---- I guess your estate's person is different than what was in Diorre? All right. How long would he have to be up there before the law would allow the police to shoot him dead? What would you say? What I would say is, first of all, the evidence is not uncontradicted that he was, quote, nodding off. There were notes taken by the officers that are in the record that make all sorts of comments about their observations. A jury does not have to believe that the reason they did this was to prevent him from falling off the ledge. For one thing, the ledge was pretty wide. There are pictures that show what he was like at the time. He got down off that bridge and under his own power. You're equating the taser miss with shooting him. No. I would agree. Exactly. They couldn't shoot him. Your Honor, and I agree that the taser is irrelevant. Because the question here is they've all decided that unless he is in a place from which the officers can stop him from getting out of the portico, that anything they do is likely to cause his death. So the linchpin of this, which was known and appreciated by everybody, was that he has to be in a place where we can stop him. The taser was only to disable him after he's been stopped. And the reason, and this is the important thing, the reason he had to be confinable is because they knew and they all testified they knew that if he was not confinable in there, the greatest likelihood was he was going to die. Okay. We appreciate your argument. I'm sorry that we don't have more time, but we don't. So thank you very much. The case just argued is submitted.
judges: Walter, Smith, Smith